**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| QUMERE MCCLENDON,<br><br>Petitioner,<br><br>v.<br><br>BRUCE DAVIS, et al.,<br><br>Respondents. | Civil Action No. 19-18811 (MAS)<br><br>**OPINION** |

**SHIPP, District Judge**

This matter comes before the Court on the amended petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2254 filed by Petitioner Qumere McClendon ("Petitioner"). (ECF No. 28.) Following an order to answer, Respondents filed an answer to the amended petition. (ECF No. 33.) Petitioner did not file a timely reply. For the following reasons, the amended petition shall be denied and Petitioner shall be denied a certificate of appealability. Petitioner's outstanding motions requesting leave to file his amended petition in its current form and to be treated as if filed within time (ECF Nos. 29-30) are granted.

**I.    BACKGROUND**

In its opinion affirming Petitioner's conviction and sentence, the Superior Court of New Jersey, Appellate Division, summarized the factual background of Petitioner's conviction as follows:

> Following a jury trial, [Petitioner] was found guilty of second-degree conspiracy to commit burglary and robbery[,] possession of a firearm for an unlawful purpose[,] second-degree burglary[,] first-degree robbery[,] first-degree felony murder of Keith Mason[,] first-

> degree aggravated manslaughter of Keith Mason[,] third-degree endangering the welfare of a child[,] second-degree witness tampering[,] and second-degree certain persons not to have weapons[.] On May 3, 2011, after appropriate mergers, the trial judge sentenced [Petitioner] to [an aggregate sentence of fifty-five years with a forty year parole disqualifier].
>
> . . . .
>
> On December 14, 2006, [Petitioner] shot and killed Keith Mason during an attempted armed robbery at Mason's apartment. [Petitioner], along with two other individuals, planned to rob Mason for the marijuana he kept in the apartment. [Petitioner] and Paul Lewis planned the robbery on the night of December 13, 2006, and while planning it [Petitioner] showed Lewis his 45-caliber automatic hand gun.
>
> [Petitioner], Lewis, and Darnell Stovall planned for Lewis to go into Mason's home first because Lewis knew Mason. Lewis would leave the door unlocked, allowing the others to enter. Before going to Mason's, the three men stopped at a store to get gloves and bandanas to cover their hands and faces. The men were driven to Mason's by Aulander Daniels.
>
> Lewis called ahead to let Mason know he was coming over to buy marijuana. Lewis, [Petitioner], and Stovall arrived at Mason's residence at approximately 3:00 a.m., and Lewis walked up an outdoor stairwell to Mason's backdoor. Mason opened the door for Lewis and they, along with Mason's two-year-old son, went to the kitchen. Shortly thereafter, [Petitioner] and Stovall entered through the back door brandishing handguns and yelled at Mason to get on the ground. Mason recognized them as friends of Lewis, and "rushed toward" [Petitioner] and Stovall, whereupon [Petitioner] fired his weapon at Mason, striking him in the chest.
>
> [Petitioner] and Stovall then fled, and Lewis departed shortly thereafter, leaving Mason's son with his father's body. Before leaving, however, Lewis called for emergency assistance on his cell phone but hung up before providing information. The operator called Lewis back and they spoke very briefly before Lewis disabled the phone.
>
> Lewis was later contacted by police and gave a statement incriminating [Petitioner].
>
> . . . .

2

Prior to trial, [Petitioner] moved to suppress statements he had made to police following his arrest. On August 5, 6, and 7, 2008, [the trial judge] held a *Miranda* [*v. Arizona*, 384 U.S. 436 (1966),] hearing concerning [Petitioner]'s statements to police on December 29, 2006.[] The State called four officers to testify during the hearing, including Monmouth County Prosecutor's Detective Jose Cruz, Long Branch Detective Raymond Chaparro, and two others. [Petitioner] presented no witnesses. On August 7, 2008, [the trial judge] rendered his findings of fact and conclusions of law on the record.

[The judge] found that on December 29, 2006, [Petitioner] was arrested pursuant to a warrant, at approximately 3:30 a.m. at his home. The police searched [Petitioner]'s home and discovered him hiding in the attic wearing a t-shirt and shorts. In front of the attic door, the police found a pile of [Petitioner]'s clothing. [Petitioner] was brought to the Long Branch Police Department for questioning. Detective Cruz and Long Branch Detective Ed Hennelly conducted the interview. [Petitioner] was read his rights and understood them.

Shortly after questioning began, [Petitioner] asked to call his lawyer. The detectives continued the questioning ostensibly to ascertain [Petitioner]'s intent, but were soon stopped by a sergeant. Detective Hennelly attempted to clarify [Petitioner]'s request, but the clarification was inadequate and the sergeant stopped the questioning again because [Petitioner] had invoked his right to an attorney.

At this point, [Petitioner] said "I'll talk to you, I'll talk to you." [The trial judge] found that [Petitioner] had his "wits about him," was not under duress, and "appeared to be jovial, joking with the officers, calm, cool, collected, sure of himself. . . ." [Petitioner] was then reread his *Miranda* rights.

[The trial judge] found that any conversation that occurred between the initial invocation and the time "where the rights were re-read, and the [Petitioner] clarified that he was willing to talk," must be suppressed. However, [the judge] also found that, while there was an invocation for a lawyer, it was [Petitioner] who "then changed his mind, knowingly and voluntarily, and after being fully advised of his *Miranda* warnings, once again, decided to continue the discussion."

During the interview, [Petitioner] consistently denied involvement in the murder and denied knowing anything about the incident. [Petitioner] only said that he had heard that Paul Lewis was at Mason's when the shooting occurred.

3

[The trial judge] also suppressed a second part of the same interview. At approximately 4:42 a.m., [Petitioner] said "I'm gonna talk to my lawyer." Detective Cruz left the room momentarily, but when he returned they continued questioning [Petitioner]. [The trial judge] found, as a matter of law, the remainder of the interview that morning must be suppressed.

Following the interview, [Petitioner] was transported from Long Branch to the Asbury Park Police Department in order to keep [Petitioner] separate from another suspect being held in Long Branch. During the ride to Asbury Park, [Petitioner] made statements to Detective Chaparro, which led him to bring [Petitioner] back to Long Branch.

Detective Chaparro testified that [Petitioner] started "mumbling that he shouldn't take a hit." Detective Chaparro asked [Petitioner] if he wanted to go back to Long Branch to speak to the detectives again. [Petitioner] wanted to be taken out of the car because he felt the car was wired, but Detective Chaparro refused. When they reached Asbury Park, [Petitioner] again said "something to the [effect that] he should have said something, should have told." Detective Chaparro took [Petitioner] out of the vehicle and [Petitioner] "said that he wanted to go back and tell his side of the story, he was gonna tell the truth and to the fact of an accident."

Detective Chaparro then put [Petitioner] back into the car, contacted the Long Branch Police Department, and set forth the substance of [Petitioner]'s statements. He then drove [Petitioner] back to Long Branch. [The trial judge] found that the statements were "made without any solicitation from any law enforcement officer[,]" and that there was "no violation of any *Miranda* warning[.]"

After returning to Long Branch [P]olice [D]epartment, [Petitioner] was reread the *Miranda* warnings, understood them, wished to waive them, and did not want an attorney present. [Petitioner] also stated that no one forced him to come back to Long Branch and that the decision to come back was voluntary.

During this interview, [Petitioner] admitted that he, Paul Lewis, and Darnell Stovall planned to rob Mason for the marijuana kept in Mason's house. He said that the plan was for Lewis to enter the house first, and leave the back door open, and that [Petitioner] and Stovall would enter the house thereafter.

[Petitioner] stated he was not involved in the shooting. He alleged that he changed his mind and never entered Mason's house, and that

4

>  he did not have a gun, and did not know Lewis or Stovall had a gun. However, later during the interview, [Petitioner] stated he knew that either Lewis or Stovall had a gun. [Petitioner] described the weapon as a black forty-five caliber handgun.
>
>  [The trial judge] found that [Petitioner]'s invocation of his right to an attorney was "overcome . . . when he [] initiated the conversation and then the officers took great pains to clarify if [Petitioner] really did want to talk and really want[ed] a lawyer when they re-read him the *Miranda* warnings. . . ."
>
>  [The trial judge] was 'satisfied there was no attempt to overbear the will of Mr. McClendon in any way, shape, or form. He was under no duress, he was comfortable, and he was ready, willing, and able at that point, to cooperate." [Petitioner]'s motion to suppress his second statement to police was denied.

(ECF No. 33-26 at 1-3.)

## II.     LEGAL STANDARD

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846-47 (3d Cir. 2013). Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication:

>  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 575 U.S. 312, 316 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### III.   DISCUSSION

In his amended petition, Petitioner presents a number of claims in which he alleges he suffered ineffective assistance of counsel. The standard applicable to claims of ineffective assistance of counsel is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984). To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.
>
> In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A

> petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . [and] a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.
>
> Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015).

Petitioner first asserts that trial counsel proved ineffective in failing to more forcefully argue that Petitioner's statement to the police should be suppressed. Petitioner argues that he was subject to duress and counsel should have called Petitioner and his mother as witnesses to support that contention. The Appellate Division rejected this claim during the appeal of Petitioner's first PCR petition, finding that: (1) Petitioner's mother could provide little information of value as she was not present during any of the interviews; (2) all of Petitioner's interviews were recorded and

provided the trial court with ample ability to gauge whether Petitioner was under duress or subjected to coercion; and (3) counsel had strategic reasons not to call Petitioner's mother as a witness in light of her partiality to Petitioner.

This decision was neither contrary to nor an unreasonable application of *Strickland* or its progeny. Although Petitioner asserts that his and his mother's testimony could have supported a contention of coercion, the trial judge, having viewed the recordings of Petitioner's interviews, was able to determine that the officers did not engage in coercion nor did they place Petitioner under duress, and that Petitioner's demeanor was generally jovial, agreeable, and collected. In light of those factual determinations and the recorded evidence, Petitioner's self-serving assertions to the contrary or his mother's largely irrelevant testimony regarding the proceedings involved in Petitioner's arrest would have been of little value in the suppression hearing. Petitioner, therefore, cannot show he was prejudiced by counsel's alleged failings as the trial court had found no evidence of coercion or duress in the recordings. As it is not likely that the outcome of the suppression motion—through which counsel did secure the suppression of several portions of the conversations with police—would have been any different had counsel taken the tact suggested by Petitioner, Petitioner cannot make out his claim of ineffective assistance of counsel. Petitioner's first claim of ineffective assistance, therefore, provides no basis for habeas relief.

Petitioner next asserts that counsel was ineffective in advising him not to testify at trial, and in so doing denied Petitioner his right to testify on his own behalf at trial. The Appellate Division rejected this claim during Petitioner's first PCR proceeding. The Appellate Division found that counsel's advice that Petitioner should not testify was reasonable in light of the evidence against Petitioner, including his own statements to the police. In addition, Petitioner had a colloquy with the trial court, during which he confirmed that it was his choice not to testify and that this decision was made by him after consulting his attorney but remained his personal decision

independent of counsel's opinions on the matter. The Appellate Division found that Petitioner failed to demonstrate coercion with respect to this decision. The Appellate Division likewise found that Petitioner failed to show any prejudice because he did not show how his testimony would have refuted any of the considerable evidence of his guilt presented at trial.

That decision was neither contrary to nor an unreasonable application of *Strickland* and its progeny. The trial record makes clear that Petitioner was given an opportunity to confirm that he did not wish to testify, confirmed that this was his own free choice, and that he was not being forced or coerced into making that decision. (*See* ECF No. 33-19 at 52-53.) Petitioner's contention that he wished to testify is thus refuted by his own statements to the trial court. Petitioner has in any event failed to show how his testimony would have affected the outcome of his trial, and thus has not shown that he was prejudiced by counsel's advice not to testify on his own behalf. In the absence of a showing of how his testimony would have affected the outcome at trial—especially considering Petitioner's recorded statements to the police admitting, at the very least, his involvement in the robbery plot that led to Mason's death—Petitioner has failed to show that he was prejudiced by counsel's advice. As Petitioner has neither shown that he was denied the right to choose whether to testify on his own behalf nor that he was prejudiced by counsel's advice not to testify, Petitioner's second ground fails to set forth a meritorious basis for habeas relief.

In his third ground, Petitioner argues that counsel proved ineffective in failing to adequately press an argument for a new trial based on Petitioner's allegation that a juror may have seen him in handcuffs, depriving him of a fair and impartial trial. The Appellate Division rejected this claim, explaining as follows:

> [Petitioner] claims his attorney should have done more about presenting all the facts about a juror who may have seen him in handcuffs being escorted and questioned [Petitioner] and the sheriff's officer about this. For the first time [in his PCR appeal], he asserts the juror saw him in handcuffs.

9

> At trial, the facts were that juror fourteen[, who was an alternate during deliberations,] did not see [Petitioner] as he was being escorted by sheriff's officers, but [Petitioner] saw the juror. Counsel made the representation to the court with [Petitioner] present, that his client did not believe the juror saw him. Counsel told the judge he did not want to highlight the issue any further to the jury other than bringing it to the court's attention. The record shows counsel conferenced with his client in the courtroom. Following their conference, counsel said "he doesn't wish me to go any further or have Your Honor question, to avoid highlighting the issue."
>
> [The Appellate Division] agree[d] with the PCR court that [Petitioner] was not deprived of effective assistance. It was reasonable strategy for defense counsel to forego highlighting that [Petitioner] was in custody when [Petitioner's] position was that the juror did not see him. [Petitioner's] rebranded position does not correspond with what occurred in the courtroom and was not otherwise corroborated.

(ECF No. 33-44 at 3-4.)

A review of the trial record indicates that Petitioner had been transported through the courthouse, rather than externally, because of inclement weather, that both counsel relaying Petitioner's version of events and the sheriff's officers who had escorted him contended that they did not believe that Petitioner had been seen by any juror involved in his case, and that after discussing the issue both Petitioner and counsel agreed that they did not wish to press the issue further or question the juror to avoid making an issue where one likely did not exist. (*See* ECF No. 33-17 at 20-21.) The record thus fully supports the Appellate Division's factual determinations that neither Petitioner nor sheriff's officers believed that Petitioner had been seen by the juror—who, as an alternate, did not participate in jury deliberations in any event—and that Petitioner himself, in addition to counsel, declined to press the issue further. Petitioner provides nothing but his own assertion to the contrary and that assertion is belied by the record itself. In light of the record's clear indication that the juror did not actually see Petitioner, the Appellate Division was correct to conclude that it was proper and appropriate trial strategy for counsel not

10

to highlight or press the issue further to create a problem that did not already exist. As that decision was a matter of sound trial strategy, Petitioner has failed to show that counsel was constitutionally deficient or that the trial court was otherwise in error in taking Petitioner's invited course of not pressing the issue with the juror. The Appellate Division's rejection of Petitioner's claim was thus neither contrary to nor an unreasonable application of *Strickland*, nor was that decision an unreasonable application of the facts. Petitioner's third ground thus serves as no basis for habeas relief.

In his fourth and sixth grounds for relief, Petitioner contends that counsel proved ineffective in failing to object to a medical examiner testifying to cause of death based on an autopsy conducted by another doctor who had died prior to trial, and in failing to investigate the testifying examiner's history so that he could cross-examine the doctor on a prior autopsy that Petitioner believes the examiner bungled. The Appellate Division rejected Petitioner's claim that counsel should have objected to the testimony of the medical examiner on the grounds that he did not perform the autopsy, finding that the testimony was largely considered admissible under state law at the time. In addition, the state law case reversing course was not issued by the state Supreme Court until 2016, several years after Petitioner's conviction. Counsel, consequently, could not have been ineffective in failing to foresee a change in the law. The Appellate Division also held that the examiner testified not merely based on the prior doctor's report, but on his own review of the facts and evidence as well, which remained proper even after the change in state law. As counsel cannot be ineffective in failing to foresee a change in state law, *see, e.g.*, *Gattis v. Snyder*, 278 F.3d 222, 231 (3d Cir. 2002), and as the Appellate Division found that the medical examiner's testimony based on his own review of the evidence and the related photographs of the deceased was otherwise admissible, Petitioner has failed to show that his counsel was ineffective in failing to challenge the testimony of the medical examiner at trial.

Petitioner's contention that trial counsel should have discovered and used an allegedly bungled autopsy to impeach the medical examiner at trial fares no better. Petitioner's claim appears to largely arise from websites of dubious character, and the state PCR court specifically held that the websites in question would not have been admissible for impeachment purposes in any event. Likewise, as the Appellate Division noted in affirming the denial of Petitioner's first PCR application, neither the doctor nor the photographic evidence from the autopsy in any way identified Petitioner as the direct cause of Mason's death. Instead, they merely established a fact that was essentially undisputed – that Mason was killed by gunfire. Any attempt to impeach the medical examiner based on an unrelated allegedly improper autopsy would hardly undermine that conclusion, and it is thus clear that the outcome of Petitioner's trial would not likely have changed had counsel pressed Petitioner's impeachment argument during trial. Petitioner thus cannot show that he was prejudiced or that counsel was ineffective in relation to the medical examiner's testimony. Petitioner's fourth and sixth grounds thus provide no valid basis for habeas relief.

In his fifth ground, Petitioner asserts that counsel was constitutionally deficient in failing to challenge his arrest on the basis that Petitioner does not believe that there was a valid warrant supporting his arrest. The Appellate Division rejected this contention as it was belied by the clear facts in the record. Specifically, there was, in fact, a valid warrant on an unrelated matter outstanding against Petitioner at the time of his arrest. That warrant alone was more than sufficient to support Petitioner's arrest in December 2006 and the related search of his mother's home for Petitioner. The Appellate Division's decision was neither contrary to nor an unreasonable application of federal law or the facts of this matter. The record clearly indicates that there was a valid warrant issued for Petitioner's arrest separate and apart from the Mason matter, Petitioner provides little other than conjecture to the contrary, and the Appellate Division made clear that any effort by counsel to challenge Petitioner's arrest or its legality would have been fruitless.

12

Counsel cannot be ineffective for failing to press meritless arguments, *see United States v. Aldea*, 450 F. App'x 151, 152 (3d Cir. 2011) (counsel cannot be ineffective in failing to raise a meritless objection); *Werts v. Vaughn*, 228 F.3d 178, 203 (3d Cir. 2000) (same), and Petitioner's fifth ground thus serves as no basis for habeas relief.

      In his final claim for relief, Petitioner contends that counsel proved ineffective in failing to object to jury instructions and a jury verdict sheet which Petitioner believes "lessened" the state's burden of proof on his child endangerment charges and improperly charged the jury both on direct and accomplice/co-conspirator liability as to the shooting related charges. The Appellate Division rejected these arguments in denying Petitioner's second PCR appeal as both procedurally barred and as meritless. The trial level state PCR court provided some elaboration on the meritless finding. It specifically noted that Petitioner had been charged on the shooting related counts both as a direct participant and as an accomplice or co-conspirator, and the trial judge was thus required under state law to provide the challenged accomplice or co-conspirator jury charges because Petitioner had been so charged and the evidence presented at trial supported both direct and co-conspirator liability. The second PCR judge further noted that trial counsel's defense, in light of Petitioner's admissions to the police, largely focused on the theory that Petitioner had renounced his part in the plot to rob Mason, and challenging the idea of accomplice or co-conspirator liability would to some extent run counter to the defense's theory of the case – that Petitioner had helped plan the robbery but attempted to call it off and exit the scheme. The PCR judge further articulated that Petitioner's challenges to the child endangerment charge and jury instruction were similarly without merit. Any motion to challenge or dismiss the charged offense or the jury instruction provided would have been meritless because Petitioner was mistaken in his interpretation of the endangerment statute and both the jury charge and the underlying offense itself were well supported by state law.

The decision of the state courts to reject these claims is neither contrary to nor an unreasonable application of *Strickland*. As discussed briefly by the Appellate Division and by the PCR judge in considerable detail, the jury charges provided in Petitioner's case were well supported by the facts presented at trial, the way in which Petitioner had been charged by the state, and Petitioner's own presented defense. The state courts likewise found the jury charges themselves to be proper under state law, a conclusion this Court must credit. In light of the state courts' conclusions, any challenge by counsel to the jury charges or the child endangerment offense would have been without merit, and counsel therefore cannot have been ineffective in failing to present the challenges Petitioner now raises. *Aldea*, 450 F. App'x at 152; *Werts*, 228 F.3d at 203. Petitioner's final claim is thus meritless and presents no basis for habeas relief. As all of Petitioner's claims are without merit, his amended petition must be denied.[1]

## IV.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." "[A petitioner] satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude [that] the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because Petitioner's habeas claims are all without merit or procedurally barred for the reasons set forth above, he has failed to make a substantial showing of a denial of a constitutional

---

[1] The Court further notes that, as the state courts found this claim to be procedurally barred as time barred, this claim is procedurally defaulted and could not serve as a basis for relief absent a showing of actual innocence or cause and actual prejudice, which Petitioner has not attempted to show. *See, e.g.*, *Ross v. Adm'r E. Jersey State Prison*, 118 F.4th 553, 565-566, 565 n.3-5 (3d Cir. 2024).

right, and his petition is not adequate to receive encouragement to proceed further. This Court therefore denies Petitioner a certificate of appealability.

V.      **CONCLUSION**

In conclusion, Petitioner's amended habeas petition (ECF No. 28) is **DENIED**, and Petitioner is **DENIED** a certificate of appealability. An appropriate order follows.

*/s/ Michael A. Shipp*
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

Dated: 10/24/25